May it please the Court. May it please the Court. Sanford Weisburst for Appellant Moldex. This Court's decision should begin and end with the Mandate Rule, sometimes also called Law of the Case. In this Court's prior decision, reversing and vacating the District Court's Grants of Summary judgment to McKeon, this Court held, interpreting Qualitex, that in a color trademark case, the crucial inquiry which the District Court had not considered was whether other colors were available that achieved the same goal. The case was sent back to the District Court on remand. And on remand, the District Court did not ask or answer that question. Instead, the District Court engaged in its own new legal analysis and attempted to distinguish Qualitex, which is the key Supreme Court case upon which this Court had relied. And the District Court, for the second time, declined to consider whether other colors were available that would achieve the same goal as Moldex's green earplug. That was error. The Mandate Rule does not allow for discretion by the District Court to depart from this Court's mandate. If it did, there would be tremendous inefficiency. And that should resolve this case. Now, applying this Court's standard to the facts, again, the crucial standard is, are there other colors available that would serve the goal without stifling competition? And Moldex put in substantial evidence on that. And I would refer the Court to Opening Brief, page 3, sets out a number of the distinguishable color shades that are available to competitors. Similarly, Moldex's expert, Dr. Burns, at Excerpts of Record 101 and 107, explains that there are hundreds of color shades that are available. 3M, which is one of Moldex's competitors, actually has a registered trademark on a color yellow earplug. And that inquiry, at the very minimum, could be resolved by the jury in Moldex's favor. And that's the crucial inquiry. It was not undertaken by the District Court on remand. So we ask that this Court vacate and reverse for that reason. Now. So your mandate argument, are you relying on the actual language from the Mem Dispo that was filed? Or are you relying on the oral argument? No, I'm relying on the Mem Dispo, not on the oral argument. Okay. So what language exactly are you referring to? If you look at Excerpts of Record page 7, sorry, page 14. I'm looking at the Mem Dispo. I have it at Excerpts of Record page 14 as a reprint of the Mem Dispo. And this Court interpreted Qualitex to hold that the green-gold color on the dry-cleaning press pads could receive trademark protection despite some functionality as other colors achieved the same goal of hiding stains. And then if the Court would turn to the next page, ER 15, the Court, this Court remanded, said, we leave it to the District Court to assess functionality in light of Qualitex in the first instance. And just to throw in one other point, in the middle paragraph that I skipped over in reading this, this Court ruled that the District Court had erred in applying the disc golf factors as exclusive factors. That was too rigid an approach, this Court said. The District Court on remand had to go further and apply the Qualitex inquiry. Now, my adversary has said, well, Traffix, a subsequent Supreme Court case, which was Qualitex was 1995, Traffix was 2001, I believe. My adversary, as well as the District Court, says, well, Traffix sort of displaced Qualitex. But that's not true. And that can't be accepted by this Court, again, for the simple reason that all of those arguments were before this Court the first time around. The Court did not adopt Traffix. It adopted Qualitex, and for good reason. The reason is that Qualitex involved a color, Traffix involved a functional spring design for a traffic cone, and involved an expired utility patent. Totally distinguishable case. There's some language in Traffix that arguably could be said to be confusing, but this Court in the prior decision said, we're going to look at all that, and what we have to apply, because we're bound by the holdings of the Supreme Court, we have to look first and foremost to the color case of the Supreme Court, which is Qualitex. What I think is that, and I'm only speaking for myself, I think Judge King would be surprised that he did consider and evaluate in the first instance how he thought Qualitex applied. So the district court, I will concede, cited and discussed Qualitex in the decision on remand. However, the very same arguments for why traffic should apply instead of Qualitex were before this Court the first time around. And those, and I've set that out, particularly in my reply brief, showing that the exact same arguments were before this Court. And so it's not that the district court did not discuss Qualitex. I don't want to overstate that. But the district court was erroneous, and in fact erroneous on the same grounds that this Court had already rejected. Now, if Judge Wardlaw, if you're asking me what, why is traffic, why does traffic not displace Qualitex, I'm happy to address that question. No, I'm not asking you that. I'm saying, I just don't accept your mandate argument, given the lengthy discussion and his, I mean, he distinguishes, actually, yeah, he distinguishes Qualitex from the issue. So I guess, if I were in your shoes, I would be arguing that he applied Qualitex, Qualitex is the correct case to apply, and that he applied it incorrectly. I will turn to that argument right now. Okay. And the reason, first and foremost, Qualitex is a color case, green gold color on dry-cleaning press pads. The Court said it's source-identifying because it shows people that Qualitex made these press pads. It also serves a function, the Supreme Court ruled in an opinion by Justice Breyer, and the function is to hide stains, right? If it's a color, and a sufficiently dark color, you won't see the stains, and people like not to see the stains. When they bring their clothes to the dry cleaner, they don't want to feel like the clothes are going to come back dirtier than they came in. So that's the function, and what the Court held in Qualitex was, well, you have to consider whether other colors would achieve the same goal. Now, traffics, not a color case, did not involve, it involved a structural patent, a utility patent, an expired patent, and the Court did not purport to overrule Qualitex. We don't lightly assume that the Supreme Court overrules its prior cases. It, in fact, cited Qualitex. Now, the, this Court, if I can turn to this Court's case law. So this Court has never addressed color in a published opinion. It has addressed color, of course, in this case, in an unpublished opinion. But this Court's doctrine, basically, it's not necessarily incompatible with what the Supreme Court held in Qualitex. And I'd like to propose a way of reconciling, which I think is the same as what the prior, this Court did on the prior panel, and that is the discall factors, which the Court is familiar with. The problem with the way the district court had applied those here was he applied them too rigidly, as this Court held. And what the Court said was if you have three factors that point in one direction and one factor that applies in the other direction, you have to grant summary judgment. Now, that stemmed from this Court's decision in the Talking Rain case. But, frankly, that sort of three versus one notion is not present in many of these, this Court's other cases. This Court has never, again, considered color in a published decision. And the best way to reconcile color into this Court's existing framework of those that this Court held in the prior decision in this case, not to view any one factor or any three factors as dispositive. Instead, the factors should be weighed in their totality. And that is the crucial error that the district court did not make, that the district court made on remand, is he did not go on and address how many colors are available. And this is an important, going to the policy of trademark law. So Moldex started making these colored earplugs in 1982, and it's invested millions of dollars in marketing this color. And it's built up a reputation. There was evidence in the record that a reasonable jury could find showed that this green color is synonymous with Moldex. And if you were allowing a competitor to come along in 2009 all of a sudden and copy the same color and make a pitch to Walmart, you could read this at Excerpts of Record 1312, to replace Moldex's green plug with McKeon's green plug. That is against the purpose of trademark law, which is taking away source identification, taking away the fruits of your investment. Now, McKeon argues, well, we need to do this because of the function, the function being visibility against skin. But the point of the Supreme Court in Qualitex and of this Court in its prior decision and the Second Circuit in Fabrication Enterprises, the case cited in Arbreece, which is very closely on point, is that you can't stop there at the summary judgment stage. You have to look at how many other colors are available because if there are a sufficient number of other colors available, there will not be an adverse impact on competition. And you can have the purpose of trademark law served without impinging upon other areas of law, such as patent, that really are about functional objects. Counsel, could you elaborate, please, on what your expert said on the color issue, on alternatives working to show visibility? Yes, Judge Gould. So I'd refer the Court to Excerpts of Record pages 101 and 107 in particular. At 101, our expert, Dr. Burns, testified, and he focused on shades of color because it's a mistake to view colors just as green and yellow and orange. At Opening Brief, page 3, we demonstrate some of these shades, and Dr. Burns sort of took stock of how many shades there were, and he said there are hundreds available. Another important record site is Excerpts of Record 107, where Dr. Burns actually plots the available color shades on sort of a colorimetric graph. And you can see from that graph sort of where Moldex's shade is and where 3M's shade, because, again, 3M has a registered trademark on a yellow earplug. And you can see also in that range what's called the American National Standards Institute, which is, according to that body at least, the most highly visible plugs. And what Dr. Burns showed in that graph, and reasonable jurors can conclude from this, that there are many very good, conspicuous, visible colors that are available. And I think an interesting sort of sidebar to that is, well, how many competitors are there in the earplug industry? I mean, are there hundreds such that they might use up all hundreds of Dr. Burns' shades? There are not. If you look at Excerpts of Record, page 1600, there's a sort of accounting of how many competitors there are in this field, and there's really only a handful. So if there are hundreds of shades, or even 20s of shades, and there are six or so competitors, there's more than enough shades to go around so that each person can pick a highly visible shade and use it without diminishing any competition. Well, you know, the yellow shade that there's a trademark on, that's probably very specific in the Pantene scale or something. But let's just assume that you wind up going to, you get by this, and you go to trial, and you get a judgment from the jury in your favor. How is your color going to be designated? I mean, there's all of this fight going on, but there are, I'm a painter, there are thousands of shades. How do you designate what your protection is so that the next series of lawsuits isn't, well, they're infringing on our shade? How do you designate it? Absolutely. And what we've tried to do, it's actually in the excerpts of Record 107, is we laid out, there's about six shades that are either the same as ours or confusingly similar. We're not seeking anything else. We've actually listed them and would stipulate in the district court which shades we believe are ours and which are open. Could you say plural or singular? Well, it's plural because we have one shade, but then there are some that are very close to it. But even with, there's a narrow window, and 3M, I think, has the same position, that leaves many, many other shades available to others. But at a minimum, those are issues of fact. If I could reserve the rest of my time for rebuttal. I have a question. Did your client register the green color as a trademark with the Trademark Office? We did not register the green color, but under this Court's and other Courts' case law, that just affects the burden of proof, so we would have the burden of showing non-functionality. I'd refer the Court to cases like Yellow Cab. I can give the site when I stand up for rebuttal. No, I think you should thoroughly answer my question because it does affect the burden, and I'm wondering how it affects it here in the summary judgment motion. I didn't mean to avoid the question. We clearly have the burden to show non-functionality, but Dr. Burns and the shades... But do you have to show no functionality at all, or to the extent that there is a, I mean, your green color is functional to some degree. Don't you agree? We agree that it has an incidental function. The main function of the earplug is to block sound. It has an incidental function to be visible. Absolutely. What we could show and did show, and a reasonable juror could find, even with the burden on us, is that there are sufficient other colors available that competition is not impacted. That's the standard that this Court laid down in its prior decision. All right. Thank you. Counsel, Judge Gould, if I could ask one more short question. Of course you can, Judge Gould. It's your time. So my question is this. If this went to a jury, what would be the jury instruction on functionality that you think would have to be given? Sure. So, again, I'm going to refer back to this Court's prior decision, which is it would include the disc golf factors, but it would also include under Qualitex that the jury must ask, are there an answer, are there enough colors available that if Moldex is allowed to protect this shade or a few shades around that shade, that there are sufficient other colors available to other competitors that competition will not be impacted? Okay. Thank you. May it please the Court, Stephen Weinberg for Appellate McKeon Products. At the table is my co-counsel, Robert Malin, who will not be addressing the Court today. As we just heard, the essence of Moldex's argument on this appeal is that Judge King should have analyzed functionality using the entire Qualitex statement of the functionality test as was quoted in the mandate memorandum. Had Judge King done that, it would have been in contradiction of the Supreme Court's post-Qualitex decision in traffics, and I will explain later why that's so relevant, and in contradiction to the post-traffics law of this circuit as set out in Automative Gold, Talking Rain, and most recently in Millennium Laboratories via Meritox 817F3-1123, which was authored by Judge Gould. To begin with, as discussed in Millennium, Qualitex needed clarification because of the way it described the functionality test. The Qualitex court had, in one part of its opinion, described the test for functionality as, quote, in general terms, a product feature is functional if it is essential to the use or the purpose of the article, or if it affects the cost or quality of the article. Close quote. That was the exact language that comes from Inwood Labs. But then the Qualitex court added its own little flourish by saying, and cannot serve as a trademark if exclusive use of the feature would put competitors at a significant non-reputation related disadvantage. And I will refer to this additional clause as the Competitiveness Necessity Clause. The Competitiveness Necessity Clause led some courts to require, in utilitarian functionality cases, which this is, consideration of competitive necessity. Wait, you say that, gloss over that, utilitarian, isn't this an aesthetic case? No, it is not. An aesthetic functionality case? Now, there is a misunderstanding in some of the courts that just because color is involved that it is a color case. There is no such thing as a color case, as I will be talking about later on. But this is utilitarian functionality, and here's really where that comes in. The question is always, is the trade dress involved, is it functional because it furthers the use or purpose of the article? So, for example, going back to the original Inwood case, the real discussion of functionality was in Justice White's concurrence. And what he said was that it has to be, if it's an important ingredient in the success of the product, the feature itself, then you're dealing with utilitarian functionality. It's the use and the purpose. Aesthetic functionality only comes in, as described in the Automotive Gold case, which addressed it in detail, where a plaintiff is arguing to get around non-functionality, that no, what I have added is, what I've done is just mere ornamentation, or as the traffics court said, it's an arbitrary flourish. And then the court will determine whether or not there is aesthetic functionality, is whether or not the functionality, if trademark protection is given to that feature, will it in some way create competitive disadvantages? That's not involved in this case. What's involved in this case, as Judge King found, was that the feature that we're talking about, this color, is in fact useful for the use and the purpose of these earplugs. You know, the earplugs are not just to keep sound down. These earplugs are to be seen because they're highly visible. And during compliance checks, which is really how they're sold, that's a really useful function. Well, that's just one feature of them. I mean, lots of times when you're hunting or you're out driving your tractor alone like I am, it doesn't make any difference. It's only when you're in a workplace setting that that becomes important. So it isn't always important. No, it isn't. But in this case, it is. For example, in ER 789, which is one of the many examples of Moldex advertising, and this is really significant, Your Honors, they say that their PureFit earplugs come in a bright green color designed to increase compliance and facilitate compliance checks. That is how these earplugs are sold. That is what they're relying on. These earplugs are designed specifically for this specific purpose and this specific use. When I buy them in Cabela's, though, that doesn't make any difference. But the issue is what is it that they are claiming about their earplugs. And also in traffics, and this is also very important, because what the traffics court did was to say, look, what Qualitech said really has to be broken up into two parts. The inward part of that formulation, use and purpose, goes to utilitarian functionality only. The aesthetic functionality piece, compliance and necessity and looking at alternatives, only goes to aesthetic functionality. That's at 532 U.S. at 33. And you say this case has nothing to do with aesthetic functionality, right? It does not, Your Honor, because, as I've just noted, the feature that is involved here, this lime green color is highly visible, and it serves the use and the purpose of these highly visible safety earplugs. These earplugs are sold primarily, in the record, they are primarily sold for use in industrial settings, where safety is important and safety compliance is important. As a result, they are, that's why they're advertising, you know, they're advertising that this particular, you know, highly visible green earplug makes compliance checks easy. Otherwise, there'd be no reason for them to say that, and that's why people are buying it, and that's why it's being used. Well, I guess the question they want us to ask is whether there are, in fact, other, or they want the jury to answer, is whether there are other colors that would equally serve the function of visibility. Right. Well, that question actually, the answer, the short answer to that is no, there are no alternatives. And, but the reason for that. Isn't that a fact question as to whether there are alternatives? No, it's actually a legal question, Your Honor, because this is the way it's, looking, there are two places where alternatives come in in any functionality case. One, and this is, let me back up a second, because it's important for me to make this a record. In Millennium and in Automotive Gold, what the court did in interpreting traffics was to say all functionality cases are the same. There's no color, there's no this, there's no that. Whether it's aesthetic or whether it's utilitarian, we are going to analyze functionality in the same way. And what was set up, and this is the guiding law of the circuit, there is a first step of a test which analyzes utilitarian functionality. If utilitarian, under the Diskell factors, if utilitarian functionality is not then found, and if the plaintiff has claimed that its use is nearly ornamental, which has not happened in this case, it's just the opposite. They've claimed that they adopted this green color mark for trademark purposes. Then and only then does one look at alternatives. So in this case, because we're dealing with utilitarian functionality, there is no assessment of alternatives at that level. There is, however, as one of the Diskell factors, a looking at alternatives. But as counsel just mentioned, and this is the guiding law of this circuit, that if there are two or more factors favoring functionality, and this is exactly the analysis that Judge Gould did in Millennium, if there are two or more factors favoring functionality, and the third factor favors it as well or is neutral, then even if there is some evidence of alternatives, that cannot trump, it cannot negate the other factors. The rigidity, I think, that the prior panel looked at was the fact that Judge King maybe didn't mention Qualitex specifically, but Qualitex has to be looked at as the starting point in what has become an evolution of cases that deal with functionality. Traffics, which is the leading case, and it's the case on which all of this court's law has been based. Since then, Automotive Gold refers to traffics. That's why it set up the two-step test. Following that was C. Colt, Talking Rain, and most recently in the Millennium case. And it's not like you can take a little bit from here and a little bit from there. The law is absolutely what the law is. And so there is no reason to look at alternatives. Factually, the reason there's no reason to look at alternatives, well, factually, there's no alternative because we're really dealing with not a color metric expert high scientific look at, you know, what are the different kinds of colors. Your Honor, I'm sure, has experience in looking at Pantone colors and in painting. It's one thing to say through a scientific analysis, yes, we can divvy up all of these Pantone colors, you know, into different kinds of different shades. But as our experts said, and I think this is true, the human experience is that, you know, it's really not that easy to differentiate colors. And where that becomes really important in trademark law is that it's one thing to say, yes, you are claiming this narrow sliver. But trademark law protection, the scope of trademark law, extends far beyond just the name or the feature protected. It extends as far as the public is going to be confused. The trademark law really is looking ultimately at business impact. And it seems like it's hard to analyze ultimately for a jury or for a judge looking at it business impact without looking at alternatives. And even Qualitex talks about alternatives. But Qualitex, and this is really important, Qualitex has since been revised. That's what traffics was all about. I mean, I can read to you from traffics because this is really an important paragraph. And this is at 532 U.S. It is proper to inquire into significant non-reputation related disadvantage in cases of aesthetic functionality, which was the question in Qualitex. Where the design is functional under the inward formulation, that's utilitarian functionality, there is no need to proceed further to consider if there is a competitive necessity for the feature. In Qualitex, by contrast, aesthetic functionality, aesthetic functionality was the central question. There having been no indication that the green gold color of the laundry pad had any bearing on the use or the purpose, the use of the product or its cost or the quality. This is a very different case. I think what bothers me about over-reliance on traffics is that the court was heavily influenced by the fact that there had existed patent protection for a former version of the sign. And so that patents, as we know, protect functional devices. And so I think that that weighed very heavily in the court's analysis of the functionality question. Whereas in Qualitex, we had, we really had a color, and there are some colors that might do as well or not in protecting from stains. Now, I understand what you're saying, Your Honor, but toward the end of the traffics, just before You read that paragraph. I know that paragraph is in there, but it doesn't necessarily mean that there's no such thing as aesthetic functionality anymore. No, no, no. I'm not saying that. What I'm saying is aesthetic functionality is not in this case because it hasn't been raised. The defendant is not claiming that the color green that it chose was merely for just arbitrary Not merely. It served a functional purpose, but also an aesthetic purpose. But for the functionality analysis, whether it's utilitarian or aesthetic, the issue is whether or not it is, it is related, the function is related to the use and the purpose of the article. In Qualitex. Well, I think you're asking us to go back to the disc golf factors when clearly our case law has sort of evolved since then or become more nuanced. I mean, that's why you're citing three or four cases at a time. I mean, the doctrine keeps evolving and changing a little bit. Well, that is correct, Your Honor. It has been evolving and with automotive gold dealt a lot with aesthetic functionality because utilitarian functionality was not raised in that case. In Millennium, which was before the court prior to discovery being completed, when it got to Judge Gould, he went through an extensive analysis showing how one is to look at the disc golf factors. And his analysis, in fact, did not take in Qualitex because, as he explained in the case, traffics change the way Qualitex is to be interpreted. You do not look at the entire two clauses of the Qualitex quote in analyzing any functionality case. If it's utilitarian functionality, it is here because the color serves the use and the purpose of the article. So it was designed for that purpose, as I just showed you in that advertisement. Then you're dealing with utilitarian functionality. Maldex has been arguing the opposite of aesthetics. It says- Counsel, Judge Gould, if I could ask you a question, I guess I'd say as a caution, I wouldn't want to put too much weight on whatever I said in Millennium because I could have been wrong, and I'm only one judge on the panel. What I would like to know is if you were writing a jury instruction in this case, what would it instruct the jury to determine on functionality? I would use the existing Ninth Circuit model jury instruction of 15.11 that says if the feature is part of the actual benefit that consumers wish to purchase when they buy the product, the feature is functional. That's the point. The point is, is what is the benefit? Why are people buying this product? It's because it's highly visible. And as long as that feature is highly visible, it's going to be useful in compliance checks, which is exactly what Maldex says it will be. That is the reason the product is that color, and its purpose is for making compliance checks easy. So we have to accept what Maldex says is the reason why it makes the product and why it sells it in that color. Somehow I have the feeling that if we sent this back for trial, we'd have another appeal of the jury instruction from distinguished counsel here. Well, hopefully time won't tell that, Your Honor. I'd hate to be the trial judge. So you're over your time. Do you want to sum up? Thank you. I asked if you wanted to sum up or just say. What I would sum up is this. One, I think it's really important to understand that this is not the kind of case like a Tiffany blue case, where the plaintiff has just selected some color out of the air. Lime green has been used in the trade for a very long time. It's basically trying to get a monopoly over a color that it couldn't even get registered in the U.S. Patent and Trademark Office, because quite subsequent to 3M getting its yellow, the Trademark Trial and Appeal Board, which is the senior tribunal within the Trademark Office, held that the color orange for a safety earplug used for safety compliance purposes that was touted in its advertising is here, that that's the purpose it serves, was functional as a matter of law and not subject to registration. Really what's happening here is that Moldex is trying to use the court to get around that decision and get an unlimited trademark right. Did you cite to that decision? Yes. That's In Re Howard Light. It's in the. So nobody has challenged the 3M yet. All right. Well, thank you, Counselor. Thank you. And I'll give you a couple minutes, because your opponent went over a couple minutes. First, Howard Light, TTAB decision, did not consider or discuss Qualitex entitled to no weight. And the 3M yellow has been trademarked, has other colors. I'd like to refer the Court, in terms of automotive gold, post-traffics case, footnote 6. This Court is discussing the Inwood case, which again had the colored medicine pills. And the Court described that as an aesthetic product feature. The Millennium case. Counsel referred to it as something like if two factors favor one position and the other is neutral, then summary judgment be granted. That's not what Millennium said at all. I'm sure I don't need to remind Judge Gould what it said, but it weighed all four factors in the totality. And that takes me to the jury instructions question. And I understand Judge Gould's concern about a possible dispute over the jury instructions. I don't think that there will be, because we actually aren't troubled by the model jury instruction. Counsel left off the part where it goes through the disqual factors. It does not say that three factors trump one factor. It lists all four. The prior court panel in this case said, look, you can still consider the disqual factors. You can't just curtail the inquiry and not look at alternative designs. You must consider alternative designs and weigh everything. On advertising, which is another of the disqual factors, the advertisement that counsel referred to was never actually used in a publication. It was from Moldex's internal files. And if the Court looks at, for example, ER-793, you can see an advertisement that says, Moldex's green color is designed to show that it is a source identifier for Moldex and that it's visible against skin. It refers to both the source identifying aspect and the functional aspect in one breath. The advertisements are sort of a mixed bag on this. Another advertisement is 960, which is much more uniquely about source identifying. Our bottom line here is that under this Court's prior decision, as under Qualitex, as under Automotive Gold, other alternatives must be considered as part of the disqual test. This district court did not do so, and it should on remand. Thank you, Your Honor. All right. Thank you, counsel. Moldex-Metrick v. McKeon will be submitted, and this Court will stand in recess for about 10 minutes. All rise.
judges: Wardlaw, Gould, Piersol